UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------x

UNITED STATES OF AMERICA,

v.

ANTHONY KENNEDY,

Defendant.

---------------------------------------------------x

**MEMORANDUM AND ORDER**
25-CR-289 (RPK)

RACHEL P. KOVNER, United States District Judge:

Anthony Kennedy is charged with assaulting and attempting to murder a fellow inmate at the Metropolitan Detention Center ("MDC") in Brooklyn, in violation of 18 U.S.C. §§ 113 and 1113, and with possessing a weapon in that facility, in violation of 18 U.S.C. § 1791. After the alleged assault, Kennedy was moved to the MDC's Special Housing Unit, or "SHU." He was questioned there by a lieutenant that evening, without *Miranda* warnings, and then questioned by a Special Investigative Services ("SIS") technician, again without *Miranda* warnings, several days later. Kennedy moves to suppress his statements on the ground that *Miranda* warnings were required.[1] I held a hearing on the motion on October 14, 2026. As explained below, I conclude that Kennedy was not in custody for *Miranda* purposes when he made his statements, and the suppression motion is therefore denied.

## BACKGROUND

The following facts are drawn principally from the testimony at the suppression hearing. At the hearing, Federal Bureau of Prisons ("BOP") Lieutenant Michael Amaro, and SIS Technician

[1] Kennedy also moved to suppress an additional statement made during a disciplinary hearing on December 31, 2024. Because the government represents that it will not offer that statement in its case in chief, Kennedy's motion to suppress that statement is moot.

Andrew Livingston testified about the circumstances surrounding the questioning of Kennedy on December 19 and December 23, respectively. Federal Bureau of Investigation ("FBI") Special Agent Brian Warstadt testified about MDC records. Kennedy testified for the limited purpose of authenticating certain photographs taken of him in the SHU on the date of the alleged assault. I have also considered declarations submitted by Kennedy with his suppression motion and suppression reply, Kennedy Decl. (Dkt. #19-1); Kennedy Suppl. Decl. (Dkt. #22-1), though as explained below, I do not credit those accounts.

## I. December 19

On December 19, 2024, around 2 p.m., BOP staff monitoring a camera system observed Kennedy apparently striking another inmate with closed fists in a housing unit. GX-SH-4 at 1. The other inmate fell to the ground and was later transported to the hospital. *Ibid.* A BOP employee completed the first section of a BOP "incident report" describing the apparent assault. *Ibid.*

Kennedy was moved to the SHU, and around fifteen minutes after the alleged assault—at 2:15 p.m.—was photographed in handcuffs in the SHU's visitation booth. DX-SH-A. Inmates may be housed in the SHU as punishment for committing infractions within the jail, but may also be assigned to the SHU for non-disciplinary reasons, such as suicide watch, victim protection, or inmate separation. October 14, 2026 Suppression Hr'g Tr. ("Tr.") at 98:1–17. Inmates housed in the SHU are segregated from the general population at the MDC, and their movements are "significantly restricted." Tr. at 70:23–25. In contrast to general housing, inmates are almost always confined to their locked cells, even for meals, and recreation time is limited. Tr. at 71:1–21.

Sometime between 8 p.m. and 8:15 p.m., Lieutenant Amaro went to the SHU to present Kennedy with an incident report about the alleged assault and to offer him the opportunity to

comment on it. Tr. at 7:24–8:16, 15:15–17; GX-SH-4 at 3. Lieutenant Amaro spoke to Kennedy through a window in the locked door of a well-lit SHU cell. Tr. at 14:16–15:17. Kennedy was not handcuffed inside his cell, and Lieutenant Amaro was unarmed and unaccompanied by other officers. Tr. at 9:2–11.

The evidence indicates that no other inmates were present in the SHU cell where Kennedy was interviewed. Lieutenant Amaro did not specifically recall whether Kennedy had a cellmate, but he believed Kennedy was alone in the cell, and that the MDC's standard practice was for inmates to be alone when provided with an incident report. Tr. at 8:25–9:1, 26:4–20. Kennedy never declared or testified that another inmate was present when he was questioned, either in a visitation room or cell. *See generally* Kennedy Decl., Kennedy Suppl. Decl.[2]

Lieutenant Amaro spoke to Kennedy for between ten and fifteen minutes in total, but the discussion pertaining to the alleged assault lasted about two minutes. *See* Tr. at 24:1–25:19 (noting that they spent the remaining time talking "about stuff . . . irrelevant to" the alleged assault). At no time during the interview did Kennedy state that he did not want to speak to Lieutenant Amaro. Tr. at 14:1–24. Lieutenant Amaro's tone was calm, and Kennedy's tone was also calm. *Ibid.* Lieutenant Amaro presented Kennedy with the incident report and told Kennedy he could "make a comment or not." Tr. at 9:15–19, 11:22–25, 20:1–19. Kennedy responded that the individual who had been his roommate at the time of the assault "had nothing to do with" the assault. Tr. at 13:7–15. After he made that comment, the interview ended. Tr. at 15:2–4.

---

[2] At 8:21 p.m.—during the period in which Lieutenant Amaro was interviewing Kennedy—Kennedy was assigned a new SHU cell that was already occupied by another inmate. DX-SH-B (showing that Kennedy was assigned to SHU cell 125 at 8:21 p.m. on December 19); DX-SH-C (showing that another inmate was assigned to SHU cell 125 earlier that day, at 3:49 p.m.). But Lieutenant Amaro testified that he did not move Kennedy to a new cell in the SHU. Tr. at 32:10–14. Accordingly, the fact that Kennedy was assigned to an occupied cell during the period in which the interview occurred is not best understood as indicating that Kennedy was moved to the cell during the interview.

After speaking with Kennedy, Lieutenant Amaro went to an office about 20 feet away to complete additional sections of the incident report. He memorialized Kennedy's remark in a section of the inmate report reserved for this purpose, entitled "Inmate statement and attitude." According to the report, Lieutenant Amaro presented Kennedy with the investigation report at about 8:15 p.m., began his investigation two minutes later, and completed his investigation at about 8:31 p.m.

I decline to credit Kennedy's declarations describing questioning by BOP officers on December 19. Kennedy submitted two declarations in support of his suppression motion, and the Court granted a hearing after finding they generated material disputes of fact. But Kennedy chose not to testify about the circumstances of his questioning at the suppression hearing. Instead, he confined his testimony to the authentication of the photographs showing him in the SHU's visitation cell after the alleged assault. As a result, Kennedy was not subject to cross-examination regarding his account of being questioned, and I did not have the opportunity to observe his demeanor while describing the relevant events. Moreover, Kennedy's declarations are not consistent with each other or with the credible live testimony adduced at the hearing. Kennedy averred in his initial declaration that "[t]o the best of [his] recollection," he was escorted "in handcuffs," "locked in a small visitation room in the SHU," and questioned there while "[m]ultiple officers were on the other side"—conveying the impression that he was questioned in handcuffs. Kennedy Decl. ¶¶ 3–4. After the government submitted its opposition brief, Kennedy submitted a second declaration, this time asserting that he was questioned in the visitation booth in SHU on the date of the alleged assault by multiple officers without handcuffs, and attesting that he had no recollection of either being interviewed by Lieutenant Amaro or being provided with an incident report regarding the alleged assault. Kennedy Suppl. Decl. ¶¶ 3–8. Given the discrepancies

between Kennedy's declarations and Lieutenant Amaro's testimony, the divergence between Kennedy's two declarations, and Kennedy's decision not to testify, I decline to credit the account of December 19 in Kennedy's declarations. See *United States v. Polanco*, 37 F. Supp. 2d 262, 264 n.4 (S.D.N.Y. 1999) (noting that "in practice, the self-serving affidavit of the moving defendant is usually disregarded if he declines to testify at the hearing").

**II. December 23**

In the early afternoon of December 23, 2024, SIS Technician Livingston and another SIS technician conducted a second interview of Kennedy regarding the alleged assault, to "assist in determining housing assignments at the facility for the individuals involved in the incident." Tr. at 62:2–10.

The interview lasted a "few minutes." Tr. at 67:6–8. It took place in a well-lit "office that has been utilized as a supply closet." Tr. at 62:17–23. Consistent with an MDC policy of handcuffing inmates in the SHU when they are outside their cells, Kennedy was handcuffed during the interview. Tr. at 64:22–65:13. The office's door was closed but unlocked. Tr. at 63:9–15.

SIS Technician Livingston, who was unarmed, asked Kennedy what happened in a "[n]ormal, conversational" tone. Tr. at 64:16–21, 67:11–17. Kennedy responded, in substance, that the inmate who had been his cellmate at the time of the alleged assault "had nothing to do with the incident" and it was "his issue." Tr. at 65:16–21. When SIS Technician Livingston "tried to ask questions to go deeper regarding the initial question of why the incident happened," Kennedy looked at him and did not answer. At that point, SIS Technician Livingston "[s]topped the interview," and Kennedy was escorted back to his cell in the SHU. Tr. at 66:1–13.

For substantially the reasons discussed with respect to the December 19 interview, I decline to credit the account of the December 23 interview supplied by Kennedy in his declarations, insofar as it diverges from the testimony at the hearing. Kennedy stated in the declaration filed alongside

his suppression motion that he was questioned "about the incident while [he] was locked in a cell in the SHU," several days after the incident, while "alone in the cell" with "multiple officers present." Kennedy Decl. ¶ 5. It does not mention any questioning in an office that doubled as a supply room. Kennedy's reply declaration provided a different account: it did not mention this questioning several days after the incident within a SHU cell, but asserted that on December 23, 2024, "SIS officers interviewed [him] in a supply room in the SHU." Kennedy Suppl. Decl. ¶ 10. The limited facts in that reply declaration align in significant respects with the testimony of SIS Livingston at the suppression hearing. *Id.* ¶¶ 12–14 (describing handcuffing; stating that "two or three officers [were] present" for the interview; and stating that "Officer Livingston asked [him] what happened during the December 19 incident"). But because Kennedy declined to testify at the suppression hearing, and was thus not questioned about his account or subject to observation of his demeanor, and because Kennedy's own declarations diverge in their accounts of this interview, I decline to give his declarations weight.

**DISCUSSION**

Kennedy's motion to suppress his December 19 and December 23 statements based on the absence of *Miranda* warnings is denied.

*Miranda* warnings are required when "suspects who are in custody are interrogated" by law enforcement officers. *Vega v. Tekoh*, 597 U.S. 134, 141–42 (2022) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). For *Miranda*, "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508–09 (2012). The "initial step" in determining whether an individual is in custody for *Miranda* purposes is determining "whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and

leave." *Id.* at 509 (brackets, internal quotation marks, and citations omitted). This requires considering "all of the circumstances surrounding the interrogation," including "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Ibid.* (internal citations omitted). This assessment is "the first step in the analysis"—"a necessary and not a sufficient condition for *Miranda* custody." *Ibid.* (citation omitted). If an individual would not have felt at liberty to leave, the Court must go on to determine "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Ibid.*

The fact that an individual is incarcerated does not necessarily mean he is "in custody" for purposes of *Miranda*. *Howes*, 565 U.S. at 512. While an incarcerated person is not free to leave the jail, the custodial setting will not invariably present coercive pressures akin to the stationhouse questioning in *Miranda*, for several reasons. *Id.* at 511–12. First, "questioning a person who is already serving a prison term does not generally involve the shock that very often accompanies arrest." *Id.* at 511. Since "the ordinary restrictions of prison life . . . are expected and familiar," they "do not involve the same 'inherently compelling pressures' that are often present when a suspect is yanked from familiar surroundings in the outside world and subjected to interrogation in a police station." *Ibid.* (citation omitted). Second, "a prisoner, unlike a person who has not been sentenced to a term of incarceration, is unlikely to be lured into speaking by a longing for prompt release." *Ibid.* "Third, a prisoner, unlike a person who has not been convicted and sentenced, knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence." *Id.* at 512. To ascertain whether an incarcerated person is

in custody for the purposes of *Miranda*, the Supreme Court has instructed, a court should consider "all of the features of the interrogation." *Id.* at 514.

The Supreme Court provided a guidepost for this analysis in *Howes*, where it concluded that an incarcerated inmate was not in *Miranda* custody during a lengthy and tense interrogation about an alleged sex crime. 565 U.S. at 514–15. The inmate in *Howes* was escorted to a conference room between 7 p.m. and 9 p.m., then questioned for between five and seven hours. *Id.* at 503. He was advised at the start of the interview that he was "free to leave and return to his cell," although leaving would require being escorted from the conference room by a corrections officer. *Id.* at 503–04. At one point in the interview, the inmate "became agitated and began to yell," at which point one of the deputies, cursing, "told him to sit down and said that 'if he didn't want to cooperate, he could leave.'" *Id.* at 503 (brackets omitted). Over the course of the interview, the inmate "said several times . . . that he no longer wanted to talk to the deputies, but he did not ask to go back to his cell." *Ibid.*

Taking all the circumstances into account, the Court concluded that the inmate was not "in custody" for *Miranda* purposes. *Howes*, 565 U.S. at 514. The Court so concluded even though the prisoner "did not invite the interview or consent to it in advance, and he was not advised that he was free to decline to speak to the deputies." *Id.* at 515. In addition, several facts weighed in favor of a determination that the prisoner was in custody for purposes of *Miranda*: "[t]he interview lasted for between five and seven hours in the evening and continued well past the hour when respondent generally went to bed; the deputies who questioned respondent were armed; and one of the deputies, according to respondent, 'used a very sharp tone,' and, on one occasion, profanity." *Ibid.* (brackets and internal citation omitted). But those "circumstances . . . were offset by others" which were "consistent with an interrogation environment in which a reasonable person would

have felt free to terminate the interview and leave." *Ibid.* These included, of particular importance, the fact that the inmate "was told at the outset of the interrogation, and reminded again thereafter, that he could leave and go back to his cell whenever he wanted," as well as the fact that the inmate "was not physically restrained or threatened and was interviewed in a well-lit, average-sized conference room, where he was 'not uncomfortable,'" "was offered food and water, and the door to the conference room was sometimes open." *Ibid.*

*Howes* signals that Kennedy was not in custody during the brief, calm interviews that occurred on December 19 and 23 because, on balance, the circumstances of those interviews were less coercive than those in *Howes*. While the interview in *Howes* lasted five to seven hours, beginning between 7 and 9 p.m. and continuing well past the hour when the inmate generally went to bed, the interviews of Kennedy lasted between ten or fifteen minutes at approximately 8 p.m. (for the first) and "a few minutes" in the early afternoon (for the second). Tr. at 14:25–15:17, 67:6–10. While the prisoner in *Howes* was questioned in an aggressive tone, with profanity, Kennedy was presented with an incident report and told that he could "make a comment or not" in the first interview, and was asked what had happened in the second interview. Tr. 9:15–16, 11:22–25, 65:14–17. And while the deputies conducting questioning in *Howes* were armed, there is no evidence that any of those who questioned Kennedy were. It is true that the inmate in *Howes* was "offered food and water, and the door to the conference room was sometimes left open"—circumstances not present in Kennedy's interviews. But taken as a whole the circumstances of Kennedy's interviews appear considerably less coercive than those in *Howes*.

The difference between the advice of rights that Kennedy received and the advice of rights given to the inmate in *Howes* does not change that conclusion. The advice that Kennedy received on December 19 appears no less effective in communicating that the interviewee was "at liberty

to terminate the interrogation" than the advice in *Howes*. *Howes,* 565 U.S. at 509 (citing *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). The inmate in *Howes* was told he could leave and return to his cell, *Howes*, 565 U.S. at 503, but not that he could decline to answer questions, *id.* at 504. In contrast, Kennedy was advised on December 19 that he could decline to answer questions, through the guidance that he could "make a comment or not," but was not told that he could leave the interview. Tr. at 9:15–19, 11:22–25, 20:1–19. That difference appropriately reflects that Kennedy was interviewed in the cell where he was being housed; Lieutenant Amaro, rather than Kennedy, would be the one to leave at the end of the interview. Ultimately, Lieutenant Amaro's advice conveyed that Kennedy could stop end the interview, as did the advice given in *Howes*—albeit through a different formulation taking account of where the interview occurred.

While the absence of similar advice on December 23, and the use of handcuffs on that date, mean the questioning there presents a closer question, those considerations do not change the bottom line. The absence of an advisement of rights on December 23 is a differentiating factor that weighs in favor of finding that the interview was in custody for *Miranda* purposes. *See Howes*, 565 U.S. at 515. And Kennedy was handcuffed during the December 23 interview (unlike the December 19 interview), Tr. at 64:22–23, whereas the inmate in *Howes* was not, *see Howes*, 565 U.S. at 503. But those factors are not enough to render Kennedy in custody considering "all of the features of the interrogation," as compared to *Howes*. *Id.* at 514. To recap, the December 23 interview was an afternoon colloquy between apparently unarmed deputies and a handcuffed inmate that lasted "a few minutes," in a "[n]ormal, conversational tone," in which the inmate was not told he could end the interview but the interview ended once stopped answering questions. Tr. at 67:6–19. *Howes* involved an interview by armed deputies of an unrestrained inmate lasting five or more hours that kept the inmate up at night, involving raised voices and profanity; the inmate

was advised he could return to his cell, but the interview continued even after the inmate repeatedly stated that he no longer wished to speak to deputies. *Howes*, 565 U.S. at 503–04. On the whole, considering all of the factors the Supreme Court has identified as relevant, I conclude the December 23 interview presented fewer "coercive pressures" than the interview deemed non-custodial in *Howes*—notwithstanding the important advice-of-rights factor and the fact that Kennedy was handcuffed. *Howes*, 565 U.S. at 509, 514 (counseling attention to "duration," "statements made during the interview," whether interviewers were armed, "the manner in which the interview is conducted," and "release of the interviewee at the end of questioning"). Using *Howes* as a lodestar, the December 23 questioning did not involve the type of "inherently coercive pressures" presented by "the type of station house questioning at issue in *Miranda*." *Id.* at 509.

This fact that Kennedy was housed in the SHU on both occasions when he was interviewed does not, on balance, warrant a different result. The Supreme Court has focused the custody inquiry principally on conditions specifically tied to the interrogation, *Howes*, 565 U.S. at 509 (outlining factors), while suggesting that conditions *not* specifically tied to the interrogation deserve little weight, *id.* at 513 (indicating that the fact that an inmate was transported to an interrogation "under close guard" would deserve little weight because "[e]scorts and special security precautions" are not particular to the interrogation context but instead "may be standard procedures regardless of the purpose for which an inmate is removed from his regular routine and taken to a special location"). After all, *Miranda*'s requirements are based in part on the extent to which the changes in environment occasioned by the interrogation create a "shock [that] may give rise to coercive pressures." *Id.* at 511 (contrasting the "sharp and ominous change" when a person at liberty is "whisked to a police station for questioning" with the restraints inherent in the questioning of an incarcerated person, for whom "the ordinary restrictions of prison life, while no

doubt unpleasant, are expected and familiar"); *see id.* at 515 (suggesting that the fact that an inmate had to be escorted back from a conference room following an interview in jail had little importance in the custody analysis since the requirement of an escort was not particular to interrogation and the inmate "would have been subject to this same restraint even if he had been taken to the conference room for some reason other than police questioning"). Accordingly, the governing rules of an inmate's unit or facility (like their amount of out-of-cell time) are not considerations that the Supreme Court has highlighted as central to the custody inquiry. *See id.* at 509.

Given that framework, the fact that Kennedy was housed and interviewed in a unit where his time and activities outside his cell would have been highly circumscribed weighs slightly in favor of a custody finding—but not heavily enough to change the analysis in light of the other factors discussed above pointing the other direction. Kennedy's SHU placement preceded his first interview by more than six hours, GX-SH-4, and it occurred within about 15 minutes of his being observed apparently assaulting another inmate, DX-SH-1. Accordingly, a reasonable inmate would have perceived the move to the SHU as a housing change stemming from the altercation rather than a change associated with questioning that did not occur until hours or days later. Moreover, in neither of Kennedy's interviews did officers suggest that making a statement could terminate his placement in the SHU, or refusing a statement could prolong it. *Cf. Howes*, 565 U.S. at 516 (considering whether statements by officers would "coerce cooperation by threatening harsher conditions"). Taking these circumstances into account, the restrictions associated with the SHU are closer to the restrictive background conditions of incarceration, to which the Supreme Court has given little weight in the custody analysis, than the conditions specific to interrogation to which the Supreme Court has given greater weight. While I take them into consideration—and find they weigh slightly in favor of a custody finding, especially given that the SHU placement

occurred on the day of the first interview—the SHU conditions do not change the conclusion I have drawn based on all the other circumstances of the interviews, especially their brief duration and non-confrontational tone.

Considering all of the features of the interviews, Kennedy was not in custody within the meaning of *Miranda* when he made his statements on December 19 and 23.

**CONCLUSION**

For the foregoing reasons, Anthony Kennedy's suppression motion is denied.

SO ORDERED.

*/s/ Rachel Kovner*
RACHEL P. KOVNER
United States District Judge

Dated: October 28, 2026
Brooklyn, New York